**ILLINOIS TOOL WORKS, INC.,**
**Plaintiff,**

v.

**FOSTER GRANT COMPANY, INC.,**
**Defendant.**

**No. 69 C 481.**

United States District Court,
N. D. Illinois, E. D.

March 4, 1974.

As Amended March 13, 1974.

J. P. Hume/Granger Cook, Jr.; Hume, Clement, Brinks, Willian, Olds & Cook, Ltd., Chicago, Ill., for plaintiff.

Berton S. Sheppard/C. Frederick Leydig, Wolfe, Hubbard, Leydig, Voit & Osann, Ltd., Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

McGARR, District Judge.

#### I. THE PARTIES AND JURISDICTION

The plaintiff, Illinois Tool Works, Inc. (hereinafter "ITW"), is a corporation organized and existing under the laws of the State of Delaware, and has its offices and principal place of business at 8501 West Higgins Road, Chicago, Illinois.

ITW manufacturers and sells (in its Conex Division) a variety of products, including thin-wall plastic cups, thin-wall plastic tubs and plastic lids for those cups. Plaintiff's thin-wall plastic cups and tubs are covered by the Edwards' patents Nos. 3,139,213 (hereinafter '213 patent) and 3,091,360 (hereinafter '360 patent) in suit. The packages and/or lids are covered by Edwards' patent No. 3,061,139 (hereinafter '139 patent) in suit.

Defendant Foster Grant Co. (hereinafter "Foster Grant") is a Delaware corporation with a place of business in Chicago, Illinois.

Foster Grant manufactures and sells a variety of plastic cups and packages which ITW charges to be infringements of its '213, '360 and '139 patents in suit.

Edwards' first "Nestable Container" patent application Serial No. 699,678 was filed on November 29, 1957. This application did not include claims covering containers with interrupted stacking devices. On October 29, 1958, Edwards filed a continuation-in-part application, Serial Number 769,050, with CIP included claims to containers with both continuous and interrupted stacking means. Pursuant to an election of species requirement by the Patent Office, a divisional application was filed on December 13, 1962, comprising claims directed only to containers with the continuous stacking device, and this divisional application subsequently issued as the '213 patent on June 30, 1964. CIP application No. 769,050 issued on May 28, 1963 as the '360 patent, containing claims directed to containers with interrupted stackers. ITW is presently, and since the issue dates set forth above, has been the sole and exclusive owner of U.S. Letters Patent Nos. 3,139,213 and 3,091,360.

The '139 patent in suit, issued on October 30, 1962 with 13 claims and is entitled, "Self-Venting Package." This patent covers generally a lid-container package and/or lid which vents gas from the package when a buildup of pressure occurs.

The actions alleged in ITW's complaint and Foster Grant's counterclaim arise under the patent laws of the United States, 35 U.S.C. §§ 271–287. This Court has jurisdiction over the parties and the subject matter of ITW's complaint, and the subject matter of Foster Grant's counterclaim. Venue in this judicial district is proper.

#### II. DEVELOPMENT OF THE EDWARDS' NESTABLE CONTAINER INVENTIONS

For at least the past twenty-five years, the paper companies have been making and selling (1) paper drinking cups for the vending industry and for over-the-counter usage, and (2) paper tubs for dairy food products (R. 63, 69,

79).[1] The paper containers were designed to be dispensed one at a time by a dispensing device located in an automatic vending machine, at or near a counter and the like, or at a dairy filling station (R. 63–4, 455). A typical paper cup is depicted by PX–13 and a typical paper tub is depicted by PX–14[2] (R. 66–7, 69, 455–57).

Both the paper cups and tubs usually were waxed two-piece containers consisting of a paper conical wall section having an overlapped vertically glued seam and an insert or false paper bottom suitably attached to the lower end of the paper wall (R. 63–4, 66, 69, 455). These paper containers were nestable and were arranged in stacks for shipment, handling and dispensing (R. 64). The fact that they were waxed posed problem because an undesirable taste could be imparted to the product in the container (R. 66, 69) and the fact that they were of two-piece construction presented leakage problems (R. 66).

With the advent of plastic as a packaging material in the early 50's, plastic containers were made by the "injection-molded" process (PX–15; R. 70–2). Although this process was relatively expensive, injection-molded food tubs, typified by PX–15, were sold during the 50's, primarily as a premium item (R. 72).

In the mid-50's, injection-molded drinking cups (PX–17) were offered for sale by Crown Co. in relatively small commercial quantities (R. 73). These injection-molded cups (PX–17) were nestable and were arranged in stacks for shipment, handling, and dispensing (R. 74). However these containers, as made prior to the invention of the '213 patent, due to their rigidity and breakability, required careful handling in shipment and use (R. 74–5). The Crown cup (PX–17) has a stacking device comprising a vertical thickened section in the sidewall, which was not effective (R. 73).

The Crown cup jammed, and was withdrawn from the market (R. 74–5).

While the paper containers were made and priced to be high volume, disposable items, the cost of the injection-molded plastic containers confined their use primarily to premium or specialty products —being intended for reuse rather than being disposable (R. 72).

At or about this same time, other companies—for example, Caine Company —were marketing and selling a thermoformed plastic cup of the type shown by PX–16 (R. 75). This Caine cup (PX–16) has a stacking device comprised of a series of vertical protuberances around the periphery of the sidewall of the cup (R. 76). However the cups jammed or telescoped when stacked (R. 76–7). Even after several changes in the stacking device, the cup never worked properly and was withdrawn from the market (R. 76–7).

This was the general status of the container field when ITW became interested in designing, making, and commercially selling an all-plastic container (R. 63).

Prior to 1957, ITW was not in the plastic container field (R. 82–3). However in 1956, ITW became aware of and interested in a technique for thermoforming thin-sheet plastic material which could be utilized for making containers (R. 82–3). ITW investigated the use of the Politis machine and its related process, which had been developed and made the subject of patent applications, by a Mr. Charles Politis of Athens, Greece—with the view of entering the market with a line of plastic containers made by the Politis thermoforming process (R. 82–4).

In 1956, Mr. Politis gave ITW several samples of thermo-formed plastic containers made on his machine (PX–18 through PX–20), none of which had any type of stacking device (R. 82–6). In late 1956, ITW's Donald Welshon sent

1. R. refers to the trial transcript in this action.

2. PX refers to plaintiff ITW's Exhibit; DX refers to Foster Grant's (defendant's) Exhibit.

Mr. Politis a Continental Can thermoformed cup which was unsatisfactory because it jammed, but which did illustrate a more acceptable wall thickness (R. 80; PX–166).

ITW, in 1956, agreed to take an option (R. 85–6). During the option period, ITW investigated Mr. Politis' equipment in Greece and ITW's Donald Welshon made several market surveys which indicated that (1) there existed a substantial commercial potential for marketing plastic containers, and (2) ITW should first attempt to develop plastic drinking cups for the vending industry and, thereafter, should undertake to develop plastic tubs for the dairy food industry (R. 87–91, 94). ITW also learned that the process then being practiced by Politis was technically sound, but that the machinery and process would have to be improved (R. 89, 93). It was also apparent that a new cup had to be designed, because there was no satisfactory plastic cup on the market (R. 87, 94, 100, 460).

In May or June, 1957, Bryant Edwards, after working on the solution to the cup problem, conceived of a one-piece, nestable, seamless cup of thin-wall plastic material having a bottom configured to enhance its resistance to deformation, an upwardly and outwardly tapering sidewall of substantial height to permit gripping, a rim constructed to lend lateral strength to the upper end of the container, and a single continuous Z-shaped stacking ring located *either* at the rim or in the sidewall below the rim (PX–21, R. 102, 113, 454, 472–74). These designs were disclosed to and discussed by Messrs. Welshon, Black, Beart, Cathcart and Wiley who were present at an ITW meeting held on June 12 or 13 (PX–21). Mr. Fred Wiley an ITW consultant for thermo-forming machines and methods made notes of the meeting and recorded the Edwards' cup designs and volumetric calculations for such cup designs (R. 102–05, 107, 111–12, 464–471, 1025–28, 1034–43).

Because of the "apparent" advantages of locating the stacking ring at the rim (i. e., increased material for strength and quick release at top of mold), Edwards made a mold drawing (PX–22), with the stacking ring at the rim (R. 113–14, 115, 476, 477). He took the mold drawing (PX–22) to Greece, a mold was constructed, and sample cups (PX–23) of the Edwards first design were made on the Politis sample press (R. 115–17, 477–78, 1000). Some cups were also made on Politis machinery, but these cups were all scrapped (R. 480). The cups made on the sample press were brought back to the United States by Edwards in July, 1957, and were not submitted to anyone outside of ITW (R. 115–17, 482, 1000). Cups (PX–23, PX–24) made from this mold, however, jammed or stuck together (PX–25; R. 119–20, 482–86). As a result, Edwards abandoned this design and scrapped the mold (R. 120–21, 486).

Edwards then returned to his earlier design (PX–21) with the stacking ring located in the sidewall below the rim and designed an entirely new mold (R. 121, 126). Edwards made or had made several sketches and drawings in August of 1957 of the cup covered by the '213 patent (PX–26, PX–27, PX–28; R. 121, 487–88). In September, 1957, Edwards' new nestable cup (PX–29) was made on the Politis sample machine (PX–31; R. 121–22, 487–91). During September, 1957, and the following few months, the cups (PX–29) were arranged in stacks and the stackability of the new design was tested (R. 122–26, 490). The cups (PX–29) were drop tested in September, 1957, and it was observed that the stacking rings gave these cups a spring-like characteristic (R. 122–26, 490, 492).

By locating the stacking ring in the sidewall below the rim it imparted, as contemplated by Edwards in 1957, the following characteristics to the cup design:

(1) Guiding Action—the portion of the sidewall above the stacking

ring of a lower cup guides the lower shoulder (outwardly projecting) of a stacking ring of an upper cup into stacking relation with the upper shoulder (inwardly projecting) of the lower cup (R. 127, 307, 491–92).

(2) Increased Stacking Area—the upwardly and inwardly inclined section provides a wider stacking shoulder or shelf to cause greater contact area between adjacent stacking rings (R. 129, 492).

(3) Lateral or Side-to-Side Rigidity —the upper and lower shoulders prevent the sidewalls of the cups from being squashed or collapsed as a result of the cups being gripped (R. 128, 310, 492). This is of particular importance in thin-wall plastic containers.

(4) Concentricity—the side wall structure above and below the stacking ring urges the stacking ring at all times "into round", thereby assuring better stacking of adjacent stacking rings (R. 131, 313). Uniformity of stacking action is also achieved.

(5) Resiliency—by virture of the upwardly and inwardly inclined intermediate thin-wall plastic section, the stacking ring is "resilient" so that it acts as a spring which is able to withstand axial impact forces normally encountered during handling, storage, and shipment of stacked cups (R. 132, 490, 492).

The subsequently developed cup (PX–48) embodied the design features disclosed by Edwards during the June, 1957 meeting and, as defined by Claim 6, this cup further provides:

(6) Cam Action—by reason of the inclined shoulder means, additional resilience optionally may be provided to further enhance the axial resiliency of a stack of containers (R. 520–22).

The above-discussed characteristics (1) through (5) flow from and are implicitly a part of Edwards' nestable container invention as embodied in Edwards' original PX–29 cup, as disclosed in the Figures 1–5 cups of the '213 patent, and as found in Foster Grant's accused plastic cups. The above characteristics (1) through (6) flow from and are implicitly part of Edwards' nestable container invention, as embodied in Edwards' PX–48 cup, as disclosed in the Figures 6–8 cups of the '213 patent, and as found in certain ones of Foster Grant's accused plastic cups.

Subsequently, Edwards designed, produced, and tested other cups (PX–30, PX–32), which included the features of the earlier PX–29 cup but were slightly modified (R. 133–34). The PX–30 and PX–32 cups were submitted to Automatic Canteen for evaluation and testing (R. 136–38, 495).

The first substantial order was placed by Automatic Canteen, in December, 1957, for 1,000,000 plastic drinking cups (PX–32; R. 138–39). Shipment to Automatic Canteen began in Spring, 1958 with ITW's production cups (PX–33) embodying the sidewall continuous Z-shaped stacking ring (R. 142–43, 218). Several thousand of such cups were made and shipped (R. 276). However, for the reasons discussed hereinafter, the balance of this and successive orders from Automatic Canteen were filled with cups embodying Edwards' nestable container invention, having an interrupted Z-shaped stacking ring below the rim.

In accordance with its marketing plan, once ITW had developed and marketed a plastic dringing cup for the vending industry, ITW then embodied Edwards' container invention including the continuous Z-shaped stacking ring in an all-plastic tub (PX–47, PX–48) for the dairy food industry (R. 160–66, 524–25). In 1958, ITW began to expand its commercial manufacture, and its first customer for its plastic food tubs was The

Borden Company, followed by many other dairies (R. 165–67, 525).

As stated, ITW delivered several thousand of Edwards' all-plastic container invention with the continuous Z-shaped stacking ring (PX–33) to fill the Automatic Canteen order of 1,000,000 plastic drinking cups (R. 276, 503). However, as the only production machine owned by ITW was a Politis machine made in Greece, and inasmuch as this Politis machine was poorly constructed and lacked manufacturing precision, it did not produce good copies of the Edwards container (R. 500–02, 504).

Moreover, field reports indicated that these plastic cups under certain circumstances were not vending as rapidly as paper cups and that upon occasion those plastic cups, that were not properly made, caused jamming of the vending machines, thereby shutting them down and requiring the attention of a serviceman to return the machines to service (R. 143–45, 1066–68).

Faced with these problems Edwards had three alternatives available to him: hand sort acceptable cups, redesign the machinery, or redesign the cups (R. 145–46, 507–08).

Edwards elected to redesign the cup, and to this end, in June, 1958 developed an improved cup having an interrupted Z-shaped stacking ring which facilitated cup drop or separation and which permitted greater variations in manufacturing tolerances than did the PX–33 cup (R. 146–51, 508, 518–19, 1064–65). Subsequently, Edwards made several versions of this cup (PX–35 through PX–41), out of which evolved ITW's production cup PX–41 (R. 146–51, 218, 508–11). Several hundred thousand of these PX–41 cups, embodying Edwards' '360 nestable container invention, were made and shipped to Automatic Canteen (R. 152, 514, 1103).

At about this time, Edwards developed another improved cup having an interrupted Z-shaped stacking facility with cams (PX–42 through PX–46; R. 152, 156, 514–18). This cup permitted even greater variations in manufacturing tolerances than did the PX–41 cups (R. 152, 514–18). Consequently, ITW's molds were changed and the balance of the Automatic Canteen order was filled by the PX–46 cups (R. 159). ITW has continued to make and sell plastic drinking cups of the PX–46 type, because the expense involved in changing its vending cup molds back to their original form has not been justified in view of the satisfactory nature of the PX–46 cup design (R. 159–60, 218).

The PX–41 cup (embodying the nestable container invention of Claim 1 of the '360 patent) is characterized as being a one-piece nestable seamless container of thin-wall plastic construction and of a size to be gripped by one hand, having a recessed bottom, a sidewall which tapers upwardly and outwardly, a rim at the upper end of the sidewall having an increased thickness to lend lateral strength at the upper end of the container, and a circumferentially interrupted Z-shaped stacking ring formed in the sidewall below the rim (R. 150). This stacking ring, as contemplated by Edwards in 1958, is further characterized as providing:

(1) Free Cup Separation—the interrupted shoulder construction defines air passages between adjacent nested cups, thereby assuring quick and reliable separation of the lowermost cup from a stack. This feature was obtained without materially impairing the resiliency of the stacking ring (R. 148, 326–27, 512).

(2) Resiliency—the inherent flexibility of the thing plastic material in concert with the shape of the stacking ring and its integral relationship to the sidewall of the cup imparts resiliency to the stacking ring, such that it acts as a spring capable of withstanding axial impact forces normally encountered during handling, storage, and shipment (R. 149, 519–20).

(3) Easier Stripability—the interrupted shoulder construction in the stacking ring permits the cup to be more readily stripped from a mold than the Edwards cup having a continuous Z-shaped ring. This feature was obtained without sacrificing the overlap produced by the Z-shaped configuration (R. 149, 320–21, 512–13).

(4) Greater Radial Overlap—for the same ease or difficulty of stripping, the interrupted Z-shaped stacking ring can provide greater radial overlap of the contacting shoulder means than is available with a continuous Z-shaped stacking ring (R. 147–48, 512).

(5) Guiding Action—the portion of the sidewall above the stacking means of a lower cup guides the lower shoulder (outwardly projecting) of a stacking ring of an upper cup into stacking relation with the upper shoulder (inwardly projecting) of the lower cup (R. 149, 511–12). The cocking of cups encountered with "rim stacking" is eliminated.

(6) Increased Stacking Area—the upwardly and inwardly inclined section provides a wider stacking shoulder or shelf which causes greater contact area between adjacent stacking rings (R. 147–49, 512).

(7) Lateral or Side-to-Side Rigidity—the upper and lower shoulders prevent the side walls of the cups from being squashed or collapsed as a result of the cups being gripped (R. 324, 512). This is of particular importance in thin-walled plastic containers.

(8) Concentricity—the side wall structure above and below the stacking ring urges the stacking ring at all times "into round", thereby assuring better stacking of adjacent stacking rings (R. 149, 512–13). Uniformity of stacking action is also achieved.[3]

Thus, although the total area of the shelf in the stacking ring of a lower cup was reduced somewhat, the extent of the overlap produced by the Z configuration was maintained to prevent cup jamming. Edwards, therefore, obtained the benefit of more rapid separability and improved stripability without sacrificing the advantages of the Z-shaped stacking ring (R. 147–49, 154).

Furthermore, even though the stacking ring was interrupted, Edwards took advantage of the inherent resiliency of the thin-wall material and the interrupted shape to produce a stacking ring that was as resilient as the continuous Z-shaped stacking ring (R. 149). Thus Edwards also achieved the advantages of improved cup separability and improved stripability, without impairing the resiliency of the stacking ring and without lessening the ability of the stacking ring to act as a shock absorber (or spring) to protect a stack of cups from axial impact forces normally received during handling and shipment (R. 149).

## III. COMMERCIAL APPLICATION OF EDWARDS' CONTAINER INVENTIONS

Both of the Edwards '213 and '360 container inventions are used in one-piece, thin-wall plastic containers sold (1) to vending companies, for example, for vending coffee and soft drinks (R. 177, 190–91), (2) to retail purchasers for over-the-counter and home consumer usage (R. 177, 185–88), and (3) to dairies for packaging dairy food products (R. 177, 188–90). ITW and its domestic licensees make and sell such containers in large quantities (PX–33, PX–41,

---

**3.** The subsequently developed PX–46 cup (embodying the nestable container invention of claims 4, 8, 9 and 10) provides:

(9) Cam Action—by reason of the inclined cam surfaces, additional resilience optionally may be added to provide a resilient stack of cups (R. 153–56, 514–18, 520–22).

PX–46, PX–48, PX–150, PX–151, PX–153, PX–154). In addition, Foster Grant itself makes and sells such containers in large quantities (PX–61, PX–62, PX–63, PX–74 and PX–75).

For the vending industry, the plastic cups are disposed in stacked relation so as to be storable in a magazine (chute) of a dispensing device in a vending machine (R. 179). The stacked cups are delivered to vending machine operators who periodically fill the vending machine with cups and the drinking product (R. 179). The operator manually drops or places the stacked cups in the dispensing magazine which feeds the cups to a dispenser mechanism (R. 179). When the machine is activated by a coin or otherwise, the mechanism segregates the lowermost cup from the remainder of the stack, whereby under the force of gravity the cup drops from its stacked position into a filling station and is filled with a hot or cold beverage, for example, coffee or a soft drink (R. 179). The cup is then grasped by the purchaser and removed from the filling station of the vending machine (R. 179).

For the over-the-counter and home consumer market, the plastic cups are stored and shipped in stacked relation (R. 185–86). In such stacked relation, the cups are adapted to be placed in a manual dispensing device (R. 186). Generally, the lowermost cup in a stack is grasped by the user and physically separated from the stack (R. 186). For those cups designed to be used with a rigid plastic holder at fountains, cafeterias and the like, the holder engages the uppermost cup in a stack so that it can be physically removed from the stack and used as desired (R. 186–88).

For the dairy market, economy of storage, shipping space, and ultimate usage dictate that the plastic tubs be disposed in stacked relation, with freedom to be separated. The plastic tubs arrive at the dairies in stacks which are manually dropped or placed into chutes that guide the tubs into a dispenser mechanism (R. 188). This mechanism permits separation of the lowermost tub from the stack and thereafter, under the force of gravity, the tub drops onto a conveyer which then conveys the tub to a filling station where the tub is filled with the food product (R. 188). Thereafter, the filled tub is conveyed to a capper station where the tub is capped with a plastic lid (R. 188–89). Finally, the capped tub is conveyed to a cooler or to a packaging station where the filled tub is manually or mechanically placed in cartons or cases for shipment (R. 189–90). The tub, filled with the food product, is usually trucked to supermarkets and stored on shelves until purchased by the housewife (R. 189–90).

Plastic containers that are tightly wedged or jammed together cannot be separated and dispensed by the dispenser mechanism, with the result in the dairies an attendant must clear the dispenser, and in the vending industry a service call is required to clear the machine (R. 190–92). In the over-the-counter and home consumer market, if two cups stick together, either two cups will be dispensed at double cost, or service is delayed by manual separation of the cups (R. 190).

In any event, regardless of the final application and/or usage, in accordance with Edwards '213 and '360 inventions, the thin-walled plastic containers are maintained in stacked relation throughout shipment, storage, and handling, thereby permitting eventual easy and dependable dispensing and separation of the containers (R. 192–94).

## IV. DEVELOPMENT OF THE EDWARDS SELF-VENTING PACKAGE INVENTION

As stated above, prior to ITW's entry into the container field, the container industry for many years had been making paper tubs, either plain or wax-coated, for the dairy food industry (PX–14, R. 69). These companies also sold a lid or closure, made either from paper, metal or plastic, which was used to cap the tub

after it was filled with cottage cheese or other dairy food products (R. 168).

When, pursuant to its market studies, ITW decided to expand its thermoforming operations into the dairy food market in 1958–59 (R. 162), it began to make and sell an all-plastic cottage cheese tub (PX–47); (R. 162–65). At that time, ITW did not make any kind of lid and, therefore, its customer, the Borden Company, purchased a plastic lid (PX–49) made by Lily-Tulip Cup Corporation for use with plaintiff's cottage cheese tub (R. 168–69, 525). A short time after the Borden Company began packaging its cottage cheese in plaintiff's tubs with Lily-Tulip's lids, Borden received many complaints about "popping" lids (R. 169–70). This was an unexpected circumstance because "popping lids" had not been encountered as a problem in the use of sealed paper tubs. The popping was generally believed to result from the internal pressure of gas generated by the cheese. It was also observed that, after filling and capping at the dairy, the lids would pop off during handling, shipment, or storage prior to purchase by the consumer (R. 169–70, 525–27). It was observed that, since the filled packages were stacked one on top of another, a bump or jarring force caused one of the containers to bounce on top of another, thereby causing a lid to pop off (R. 338–40, 345, 528, 937–38). The "popping lids" obviously spoiled the sanitary condition of the package and rendered the cottage cheese unsalable (R. 170).

ITW's Bryant Edwards was assigned the task of solving the "lid-popping" problem, which was attributed to either trapped air or a pressure increase (R. 170–73, 339–40, 532, 534–35).[4] The first thing Edwards did was to design a lid (PX–50, PX–52) which would prevent air from being trapped in the package during the capping operation (R. 173, 529). While the lid successfully prevented "trapped air", it did not stop the lid-popping difficulty (R. 173, 530, 898–99).

Bryant Edwards then concluded that the solution to the problem required a lid that normally would seal a plastic package to prevent leakage of liquid and admission of air, but which, in response to internal gas pressure, would permit gas to escape from the package and then would promptly reseal the package when the pressure was relieved—and would have the ability to repeat this gas-venting action whenever necessary (R. 173).

In October, 1959, Edwards developed a self-venting plastic package which sealed the plastic package and preserved the sanitary condition of the package and, at the same time, permitted any gas under pressure in the package to vent to the atmosphere, and which thereafter resealed the container—all without axial dislodgment of the lid (R. 173–74). Edwards was able satisfactorily to accomplish this by a novel configuration of the engaging areas of the tub and lid, notwithstanding the flexible and delicate characteristic of these areas due to the thin-wall plastic material. Edwards made or had made drawings of his self-venting plastic lid invention, dated as early as October 29, 1959 (PX–52, PX–53, PX–55; R. 530–31). As early as October 26, 1959, Edwards made a sample of his self-venting plastic lid invention (PX–51; R. 173–178, 420). On November 4, 1959, Edwards made a sample of another form of his plastic lid invention (PX–54; R. 531–32). On December 16, 1959, Edwards added a secondary venting feature to his self-venting invention (PX–56; R. 194–96, 420).

Inasmuch as ITW did not have shallow-draw or lid printing equipment, it had the Kleer-Plastics Co., on a subcontract basis, make the lids in accordance with Edwards' self-venting lid invention (R. 536–38).[5]

---

4. The pressure increase was attributed to changes in temperature, barometric pressure and/or gas generated by cottage cheese (R. 339–40, 534–35).

5. ITW subsequently began to make its own lids (R. 536–38).

When ITW's customers used Edwards' inventive lids (OX–51 through 56) with ITW's cottage cheese tubs (PX–47, PX–48), they no longer encountered the "lid-popping" problem (R. 176, 536–37). This was and is attributable to Edwards' self-venting package invention, which (1) is embodied in Edwards' PX–51 lid and PX–47 tub, (2) is disclosed and claimed in the '139 patent in suit, and (3) found in Foster Grant's accused plastic packages.

## V. COMMERCIAL SUCCESS OF EDWARDS' NESTABLE CONTAINER AND SELF-VENTING PACKAGE INVENTIONS

The all-plastic containers and packages sold by ITW and its domestic licensees have enjoyed commercial success. That the ITW containers embody the Edwards nestable container and self-venting package inventions is unrefuted in the record (R. 835–38; PX–150, PX–153, PX–157). It is apparent that the commercial success is attributable to the Edwards nestable container inventions and not to other factors.

With respect to ITW's and its licensees' plastic containers, in each case it is Edwards' container inventions which maintain the cups in proper stacked relationship. If the cups are delivered to the customer in a jammed or wedged condition, the user incurs additional expense and aggravation (R. 190–92), and if lids pop off the package, the product is unsanitary (R. 170).

These customers have a preference for the containers and packages embodying Edwards' container inventions and are satisfied with their accomplishments and performance.

### A. The '213 Patent

ITW's sales of its plastic containers (PX–33, PX–48, PX–150) embodying the Edwards '213 container invention have been significant. During the past 14 years, ITW has made and sold in excess of 950,000,000 containers (PX–147A) under the '213 container invention.

The sales by ITW's domestic licensees (PX–151) have been even more significant. Through September of 1972, the domestic licensees have sold in excess of 2,600,000,000 containers (PX–147A) embodying the '213 invention (R. 300).

ITW's domestic licensees have paid ITW over $1,234,000.00 in royalties for the '213 container invention (PX–147A, PX–151, R. 1309–12).

### B. The '360 Invention

ITW's sales of containers embodying the '360 invention have been considerable. Since 1958, ITW has produced about 3,600,000,000 containers embodying the '360 invention (PX–148A, PX–153, R. 1312).

ITW's domestic licensees have sold over 4,000,000 containers embodying the '360 invention (PX–153, PX–154, PX–148A).

ITW's domestic licensees have paid ITW a total of approximately $520,000.-00 in royalties under the '360 invention through September of 1972 (PX–148A, PX–153, PX–154).

### C. The '139 Invention

ITW has sold over 860,000,000 packages embodying the '139 self-venting package invention (R. 1314–15, PX–149).

ITW's licensees have sold over 366,000,000 packages and/or lids embodying the '139 invention (PX–149, R. 1315). ITW's licensees have paid over $381,000.00 in royalties to ITW under the '139 invention (R. 1315).

## VI. RECOGNITION OF VALIDITY OF PLAINTIFF'S '213, '360, AND '139 PATENTS

The validity of the '213 patent in suit was vigorously contested in the ITW v. Continental Can action, No. 65 C 2179, but was sustained by both this Court (273 F.Supp. 94) and the Seventh Circuit Court of Appeals (397 F.2d 517). Notwithstanding the *Continental Can* decision, Sweetheart Plastics, Inc. again contested the validity of the '213 patent in the ITW v. Sweetheart action. Again, the District Court upheld the validity of

the '213 patent (306 F.Supp. 364) and the Seventh Circuit Court of Appeals again affirmed (436 F.2d 1180). Thus the Seventh Circuit has twice held the '213 patent valid.

The validity of the '360 patent was also in issue in the *Sweetheart* case. Its validity was upheld by both the District Court and the Seventh Circuit Court of Appeals (436 F.2d 1180).

The '139 patent was also in issue in the *Continental Can* case and its validity was sustained by both the District Court and the Seventh Circuit Court of Appeals.

## VII. FOSTER GRANT INFRINGES THE '213 PATENT

ITW charges that all of Foster Grant's cups having continuous Z-shaped stacking rings, represented by the PX–61, PX–62, and PX–63 cup groups, infringe one or more of the asserted claims 1, 2, 3, 5, 6, 7, 8 and 9 of the '213 patent.[6]

### A. The Wilson-Dow Cup and the PX–61 Cup Group

The Wilson-Dow cup is represented by the PX–61 cup group (no longer in commercial production). This PX–61 cup group, in turn, is represented by its "chairman", the Wilson-Dow 12-ounce cup (PX–61A–1). This cup "chairman" (PX–61A–1), like each member of this PX–61 cup group, has a Z-shaped stacking ring in the lower part of the sidewall.[7]

ITW's Edwards prepared claim chart PX–68 (in PX–72) which shows how the elements of Claim 1 of the '213 patent read on the Fig. 1 embodiment of the '213 patent. He further prepared claim chart PX–69 (in PX–72) which demonstrates how each of the elements of Claim 1 of the '213 patent read on the Wilson-Dow cup "chairman" (PX–61A–1) (R. 639–41). This same claim chart, PX–69A, shows how the stacking ring element of Claim 1 reads on the stacking ring embodied in the Wilson-Dow cup "chairman" (PX–61A–1) (R. 640).

6. ITW's infringement charge for the '213 patent is as follows:

| Foster Grant Cups | Exhibits | |
|---|---|---|
| Wilson-Dow 12 oz. | (PX–61A–1, TDX–7) | 1, 2, 3, 5, 6, 7 & 9 |
| Wilson-Dow 16 oz. | (PX–61B–1, TDX–1) | 1, 2, 3, 5, 6, 7 & 9 |
| Wilson-Dow 8 oz. | (PX–61C–2, TDX–196) | 1, 2, 3, 5, 6, 7 & 9 |
| Wilson-Dow 32 oz. | (PX–61D–2, TDX–199) | 1, 2, 3, 5, 6, 7 & 9 |
| Wilson-Fos. Gr. 32 oz. | (PX–62A–1, TDX–14) | 1, 5, 6 & 9 |
| Wilson-Fos. Gr. 32 oz. | (PX–62B–1, TDX–9) | 1, 5, 6 & 9 |
| Wilson-Fos. Gr. 16 oz. | (PX–62C–1, TDX–3) | 1, 5, 6 & 9 |
| Wilson-Fos. Gr. 8 oz. | (PX–62D–1, TDX–20) | 1, 5, 6 & 9 |
| Wilson-Fos. Gr. 8 oz. | (PX–62E–2, TDX–226) | 1, 5, 6 & 9 |
| Foster Grant 12S | (PX–63A–1, TDX–154) | 1, 5, 6, 8 & 9 |
| Foster Grant 7S | (PX–63B–1 | 1, 5, 6, 8 & 9 |
| Foster Grant 8S | (PX–63B–1, TDX–152) | 1, 5, 6, 8 & 9 |
| Foster Grant 8ST | (PX–63C–1, TDX–150) | 1, 5, 6, 8 & 9 |
| Foster Grant 12ST | (PX–63D–1, TDX–153) | 1, 5, 6, 8 & 9 |
| Foster Grant 16SO | (PX–63F–1, TDX–158) | 1, 5, 6, 8 & 9 |
| Foster Grant 16T | (PX–63G–1, TDX–155) | 1, 5, 6, 8 & 9 |
| Foster Grant 16S | (PX–63E–1, TDX–156) | 1, 5, 6, 8 & 9 |
| Foster Grant 24TA | (PX–63H–1, TDX–160) | 1, 5, 6, 8 & 9 |
| Foster Grant 32T | (PX–63N–1, TDX–162) | 1, 5, 6, 8 & 9 |
| Foster Grant 32S | (PX–63I–1, TDX–166) | 1, 5, 6, 8 & 9 |
| Foster Grant 32SO | (PX–63J–1, TDX–164) | 1, 5, 6, 8 & 9 |
| Foster Grant 32SS | (PX–63K–1, TDX–167) | 1, 5, 6, 8 & 9 |
| Foster Grant 32SSO | (PX–63L–1, TDX–163) | 1, 5, 6, 8 & 9 |
| Foster Grant 32SSU | (PX–63M–1, TDX–165) | 1, 5, 6, 8 & 9 |

7. Three of the Wilson-Dow "chairmen" (PX–61A), which were partially sectioned, are illustrated in drawing PX–64 in PX–67.

Edwards further recited how Claim 1 applies both structurally and functionally to the Wilson-Dow cup "chairman" (PX–61A–1) (R. 641–43). In this connection, because Edwards did not have a stack of any of the Wilson-Dow cups, he relied upon his experience in the thinwall plastic cup field to confirm that the stacking ring in the Wilson-Dow cup "chairman" performed (1) its intended shock absorbing function of protecting the stack from axial impact, and (2) its intended stacking function of preventing jammed cups (R. 641–43). Edwards also testified how each of the asserted claims reads on and is infringed by the Wilson-Dow cup "chairman" (PX–61A–1) (R. 643–46).[8]

Despite the contrary testimony of Foster Grant's expert witness, Mr. Johnson, the Court finds Edwards' conclusions compelling and adopts them.

Foster Grant's contentions that the Wilson-Dow cup group (PX–61) does not infringe Claims 1, 5, 6 and 9 are without merit. With respect to the Wilson-Dow cup group (PX–61) there is a real identity of means, operation, and result between the asserted claims, and the Wilson-Dow cup group (PX–61) infringes these asserted claims of the '213 patent.

B. The Wilson-Foster Grant Cup and the PX–62 Cup Group

The Wilson-Foster Grant cup is represented by the PX–62 cup group (no longer in commercial production). This PX–62 cup group, in turn, is represented by its "chairman", the Wilson-Foster Grant 32-ounce cup (PX–62A–1). This cup "chairman" (PX–62A), like each member of the PX–62 cup group, has a continuous Z-shaped stacking ring located immediately below the rim in the sidewall.[9]

ITW's Edwards prepared claim chart PX–70 (in PX–72) which shows how the elements of Claim 1 of the '213 patent read on the Wilson-Foster Grant cup "chairman" (PX–62A–1) (R. 646–47). This claim chart demonstrates how the stacking ring element of Claim 1 reads on the stacking ring embodied in the Wilson-Foster Grant cup "chairman" (PX–62A–1) (R. 647–48). In this connection, because Edwards did not have a stack of these cups, he relied upon his experience in the plastic cup field to confirm that the stacking ring in the Wilson-Foster Grant cup "chairman" performed (1) its intended shock absorbing function of protecting the stack from axial impact, and (2) its intended stacking function of preventing jammed cups (R. 648–49). Edwards also testified how each of the asserted claims reads on and is infringed by the Wilson-Foster Grant cup "chairman" (PX–62A–1) (R. 650–57).[10]

Despite the contrary testimony of Foster Grant's expert witness, Johnson, the Court adopts the testimony and conclusion of Edwards that the Wilson-Foster Grant cup group (PX–62) infringes Claim 1 of the '213 patent, and concludes further that the Wilson-Foster Grant cup group (PX–62) infringes Claims 5, 6 and 9 of the '213 patent.

With respect to the Wilson-Foster Grant cup group (PX–62) there is a real identity of means, operation and result between the PX–62 group and the asserted claims of the '213 patent. Clearly, the asserted claims of the '213 patent are infringed by the PX–62 cup group.

C. The Foster Grant Current Commercial Cup and the PX–63 Cup Group

The Foster Grant current commercial cup is represented by the PX–63 cup

8. Edwards also recited how each of the asserted claims applied to the Wilson-Dow 16-ounce cup (PX–61B), the 8-ounce cup (PX–61C), and the 32-ounce cup (PX–61D), the other members of this cup group (R. 643–646).

9. Three of the Wilson-Foster Grant "chairmen" (PX–62A–1), which were partially

sectioned, are illustrated in drawing PX–65 in PX–67.

10. Edwards also recited how each of the asserted claims applies to the Wilson-Foster Grant 32-ounce cup (PX–62B), the 16-ounce cup (PX–62C) and the 8-ounce cup (PX–62D), the other members of this group (R. 650–57).

group. This PX–63 cup group, in turn, is represented by its "chairman", the Foster Grant 12S cup (PX–63A–1). This cup chairman (PX–63A–1), like each member of the PX–63 cup group has a continuous Z-shaped stacking ring located immediately below the rim in the sidewall.[11]

ITW's Edwards prepared claim chart PX–71A (in PX–72) which shows how the elements of Claim 1 of the '213 patent literally read on the Foster Grant current commercial cup "chairman" (PX–63A) (R. 590–93). This claim chart PX–71 (in PX–72) specifically shows how the stacking ring element embodied in the Foster Grant current commercial cup "chairman" (R. 593–619). In this connection, Edwards conducted inking tests, statis load compression tests, comparator load tests, and drop tests on the chairman of this group (R. 600–611, 658). He confirmed that the stacking ring had the claimed characteristics and performed (1) its intended shock absorbing function of protecting the stack from axial impact, and (2) its intended stacking function of preventing jammed cups (R. 602–11).

Edwards also testified how each of the asserted claims reads on and is infringed by Foster Grant's cup "chairman" (PX–63A) (R. 619–626).[12] More specifically, Edwards prepared claim chart PX–71AA (in PX–72) to demonstrate how the elements of Claim 6 of the '213 patent read on the Foster Grant cup "chairman" (PX–63A) (R. 620–22). He explained how the claimed camming element was embodied in the Foster Grant cup "chairman" (R. 621–22).

It is evident from the '213 patent and its file history that Claim 1 defines Edwards' container invention over a container having a rim stacker (R. 1150–1155). In a rim stacker, the rim structure itself comprises the upper shoulder and no shelf or support structure is provided apart from, in addition to, and spaced below the rim, as defined in Claim 1. In contrast to the prior art containers having prior rim stackers, the Foster Grant cup "chairman" (PX–63A) has its Z-shaped stacking ring provided as a separate element located apart from and spaced below the rim.

The pertinent language of Claim 1 of the '213 patent applies to Foster Grant's current commercial cups. Specifically, Claim 1 of the '213 patent calls for a "rim of predetermined axial extent which is of sufficient increased lateral width . . . to lend required lateral strength to said open upper end." This language reads upon the crown or upper part of the cup. Between the "rim" and an upper shoulder of the stacking ring is a wall portion extending in the same general upwardly direction as the side wall. The angle of the "wall portion" on Foster Grant's current commercial cups is 9° 38″, which is almost identical to the side wall which is 9° 30″ (PX–63A–2, R. 2606).

Beneath the "rim" and the "wall portion" is the upper shoulder or shelf of the stacking ring, designated as "stacking ring". Thus, each of Foster Grant's current commercial accused cups has a "rim of predetermined axial extent" and "a stacking ring means . . . positioned below and spaced axially from said upper rim . . . (and having) an axial extent greater than the axial extent of the rim portion", as called for by asserted Claim 1.

The stacking ring in Foster Grant's current commercial cup has the same

---

11. Three of the current commercial cups (PX–63A) which were partially sectioned are shown in photograph PX–66B (in PX–67).

12. Edwards also recited how each of the asserted claims applies to Foster Grant's current 8S cup (PX–63B), 8ST cup (PX–63C), the 12ST cup (PX–63D), the 16S cup (PX–63E), the 16SO cup (PX–63F), the 16T cup (PX–63G), the 24TA cup (PX–63H), the 32S cup (PX–63I), the 32SO cup (PX–63J), the 32SS cup (PX–63K), the 32SSO cup (PX–63L), the 32SSU cup (PX–63M), and the 32T cup (PX–63N) (R. 619–626).

means, identity, and result as the Edwards' claimed stacking ring.

Foster Grant relies on a statement in the specification of the '360 patent to equate lip and rim. The statements in the specification of the '360 patent are irrelevant to the claims in the '213 patent. The Court does not consider the lip to be the rim, but rather to be a separate entity attached to the rim. Irrespective of the definition of rim used, the stacking ring in Foster Grant's current commercial cups has an axial height greater than the axial extent of the rim and infringes this element of the '213 claims.

Further, the '213 claims call for the stacking ring means to have an "axial extent greater than the axial extent of the rim portion." This element refers to "rim portion" and not to "rim" or "upper rim" used in the earlier claim language. Thus, it follows that the "rim portion" was intended to cover structure other than "rim"—and it is reasonable to conclude that "rim portion" embraces all of the portions associated with the rim, namely, the downwardly extending flange or the undercurled lip.

Parenthetically, the rim element is defined as "a rim of predetermined axial extent which is of sufficient increased lateral width . . . to lend required lateral strength to said open upper end." There is no reference in the claim to the axial extent being predetermined to fit into the "mechanisms in the vending machines". The claim element simply requires that the "rim be of predetermined axial extent which is of increased lateral width . . . to lend required lateral strength to the open upper end." This language is in accordance with the definition of rim in Claim 1.

Relying upon the prosecution histories of the various patent applications relating to the '213 and '360 patents, Foster Grant develops a "file wrapper estoppel" argument. In support of its estoppel argument, Foster Grant alludes to the original specification. Reference to the specification is irrelevant, since it is the claims of the '213 patent which are in issue.

Foster Grant also refers to the C.I.P. application (PX-7) and to the rim stacking embodiment of Fig. 21. However, any reference to this embodiment, which was specifically deleted by ITW's attorneys in accordance with the Rules of the Patent Office, is irrelevant.

Similarly, Foster Grant's analysis of the prosecution history of the C.I.P. specification (PX-7) which matured into the '360 patent is irrelevant. The prosecution history leading to the allowance of different claims in the '360 patent is also irrelevant to the scope of the claims in the '213 patent.

Foster Grant also relies upon the prosecution history of the '213 patent (PX-6) and suggests that Claim 1 was allowed only because the pending claim was amended to add the "rim" element and the "stacking ring means . . . positioned below and spaced axially from said upper rim." Actually, by the final amendment, the claim was "amended" in a variety of ways, not in the single way suggested by Foster Grant, and further, the claim was amended to distinguish over all of the references previously cited by the Patent Office, not to distinguish solely over the Aldington patent as suggested by Foster Grant.

Under the remarks in the final amendment, ITW's attorneys flatly stated "This amendment is being submitted after careful consideration of the newly cited patent to Aldington and after a very careful review of all of the references of record in this application."

The Court finds no file wrapper estoppel which prevents the asserted claims from being infringed by Foster Grant's current commercial cups.

Foster Grant's witness, Mr. Johnson's contention is that the Foster Grant cup "chairman" (PX-63A-1) does not have an "intermediate section of the stacking means inclined inwardly and upwardly" to provide a "Z" configuration (R.

2119–20). This contention is apparently premised on Foster Grant's use of an "S"-shaped stacking ring. However, the "S"-shaped stacking ring does embody the "Z" characteristic (configuration) as defined by the claim itself.

The pertinent claim language applies to Foster Grant's current commercial cup. The intermediate section does have at its lower extremity "internal shoulder means." The intermediate section is "inclined inwardly and upwardly . . . to provide a thin wall resilient support. . . ."

The language of Claim 1, on its face, is broad enough to cover either Z-shaped or S-shaped supports for the internal shoulder means. The claim calls for the "support converging toward the cup axis from bottom to top sufficiently to increase lateral strength of the stacking ring means and to increase radial extent of the internal shoulder means." This claim language responds to the intermediate support in Foster Grant's current cup that must and does converge toward the cup axis to perform the desired function of increasing lateral strength and radial extent. Foster Grant's current cup (PX–63) has an S-shaped stacker embodying the Z-characteristic specifically defined in Claim 1.

Further, the intermediate section of the Foster Grant current commercial cup is generally or substantially "inclined inwardly and upwardly toward the cup axis." The intermediate section in the stacking ring in the Foster Grant cup has, immediately above the lower shoulder: first, a generally vertical portion; then an inwardly and upwardly inclined portion; then a vertical portion which joins the upper shoulder means.

Foster Grant contends that, under the patent in suit, the intermediate section of the stacking ring must be "more resilient than [that of] the container" (R. 2132) or the claimed stacking devices to "be more resilient than other stacking devices." (R. 2132) There is nothing in Claim 1 requiring the intermediate section to be "more resilient" than either the container or any other stacking device.

Finally, the contention that the intermediate section is not "inclined inwardly and upwardly" is without merit. The Foster Grant cup "chairman" (PX–63A–1) has an intermediate section "inclined inwardly and upwardly."

Foster Grant's current commercial cup group (PX–63) infringes Claim 1 of the '213 patent.

Foster Grant contends that Claims 5, 6, 8 and 9 of the '213 patent are not infringed, because at least one of the shoulder means is not "adapted for camming engagement" and does not "enhance axial resiliency to a stack. . . ." Foster Grant contends that none of the Foster Grant current commercial cups "had the characteristics, in compression, of the various ITW containers. . . ." This is not the test. On the contrary, the test is whether the accused cups have the claimed "camming engagement" and "axial resiliency".

On this point, the evidence demonstrates that the Foster Grant current commercial cups had camming action, their stacks compressed in response to axial forces, and were axially resilient (R. 2348, 2553–56, 2626–27, 2633). Moreover, in Foster Grant's patent (PX–98), it is admitted that when "nested containers are compressed in an axial direction, an appreciable amount of 'give' or resiliency is present due to the sliding of adjacent containers" (Col. 4, 1.39–41). Whether these Foster Grant cups have more or less camming engagement or more or less axial resilience than other cups is irrelevant.

In regard to Claims 8 and 9, Foster Grant challenges both claims, on the ground that the stacking ring in the current commercial cups cannot be "sinuous" (Claim 8) and its shoulder be a "straight line" (Claim 9). This misconstrues the language of Claim 9, since Claim 9 calls for the shoulder presenting a "substantially straight line", not a straight line. Both Claims 8 and 9 can be asserted without any inconsistency.

Further, the cross-section of the stacking ring in Foster Grant's current commercial cups is "sinuous", as called for by Claim 8, and the shoulder means are each "a substantially straight line".

Foster Grant's current commercial cup group (PX–63) infringes Claims 5, 6, 8 and 9 of the '213 patent, and there is a real identity of means, operation, and result between the asserted claims of the '213 patent and the PX–63 cup group.

## VIII. FOSTER GRANT INFRINGES THE '360 PATENT

ITW charges that all of Foster Grant's cups having interrupted Z-shaped stacking rings, represented by the PX–74 and PX–75 cup groups, infringe one or more of the asserted Claims 1 and 3 of the '360 patent.

The Wilson-Champion cup is represented by the PX–74 cup group (no longer in commercial production). This PX–74 cup group, in turn, is represented by its "chairman", the Wilson-Champion 12-ounce cup (PX–74A). This cup "chairman" (PX–74A), like each member of this PX–74 cup group, has an interrupted Z-shaped stacking ring located immediately below the upper margin in the sidewall.

ITW's claim chart PX–79A (in PX–82) shows how the elements of Claim 1 of the '360 patent read on the Fig. 1 embodiment in the '360 patent (R. 669–75). ITW further introduced claim chart PX–80A (in PX–82) which demonstrates how the elements of Claim 1 of the '360 patent apply to the Wilson-Champion cup "chairman" (PX–74A) (R. 714–15). This same claim chart,

PX–80A, shows how the stacking ring element of Claim 1 reads on the stacking ring embodied in the Wilson-Champion cup "chairman" (PX–74A) (R. 715–16).[13]

I find that each of the asserted claims reads on and is infringed by the Wilson-Champion cup "chairman" (PX–74A) (R. 716–19).

With respect to the Wilson-Champion cup group (PX–74), there is an identity of means, operation and result between the asserted claims of the '360 patent and the PX–74 cup group. The asserted claims of the '360 patent are infringed by the PX–74 cup group.

Foster Grant has asserted a Statute of Limitations defense under 35 U.S.C. § 286. ITW contends that this six-year Statute of Limitations is not applicable, since ITW had asserted, by the filing of its complaint in 1969, that the Wilson-Champion cups were infringements. Although the complaint at that time did not charge Foster Grant with infringement of the '360 patent, it did, based on the information known to ITW at that time, charge Foster Grant with infringement of the '213 patent.

Rule 15(c) of the Federal Rules of Civil Procedure states that an amended pleading "relates back to the date of the original pleading" "whenever the claim or defense asserted in the amended pleading arose out of the same conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." This rule does not apply here. An alleged infringement of one patent is not the "same conduct, transaction or occurrence" as the alleged

13. ITW's infringement charge for the '360 patent is as follows:

| Foster Grant Cups | Exhibits | '360 Claims Infringed |
|---|---|---|
| Wil-Champ. 12 oz. | (PX–74A–1, TDX–70) | 1 and 3 |
| Wil-Champ. 16 oz. | (PX–74B–1, TDX–2) | 1 and 3 |
| Wil-Champ 8 oz. | (PX–74C–2, TDX–202) | 1 and 3 |
| Wil-Champ. 32 oz. | (PX–74D–2, TDX–204) | 1 and 3 |
| Fos. Gr. 16 SWV | (PX–75A–1, TDX–402) | 1 and 3 |
| Fos. Gr. 16 SU | (PX–75B–1, TDX–159) | 1 and 3 |
| Fos. Gr. 20 PB | (PX–75C–1, TDX–296) | 1 and 3 |
| Fos. Gr. 24 TB | (PX–75D–1, TDX–161) | 1 and 3 |

infringement of another patent. The statute of limitations applies to and bars ITW from recovering for the infringement of Claims 1 and 3 of the '360 patent resulting from the manufacture and sale of the above-described Wilson-Champion cups.

The Foster Grant current commercial cup is represented by the PX–75 cup group. This PX–75 cup group, in turn, is represented by its "chairman", the Foster Grant 16 SWV cup (PX–75A). This cup "chairman" (PX–75A), like each member of the PX–75 cup group, has an interrupted Z-shaped, stacking ring located immediately below the upper margin in the sidewall.[14]

ITW's Edwards prepared claim chart PX–81A (in PX–82) which shows how the elements of Claim 1 of the '360 patent read on the Foster Grant current commercial 16 SWV cup "chairman" (PX–75A) (R. 685–86). This claim chart PX–81A (in PX–82) shows how the stacking ring element applies to the stacking ring element embodied in the Foster Grant current commercial cup "chairman" (R. 685–91). Edwards further recited how Claim 1 applies both structurally and functionally to Foster Grant's "chairman" (R. 685–91). In this connection, Edwards identified the interruptions in the interrupted stacking ring in this "chairman" (PX–75A–4) (R. 692), and discussed manometer air communication tests he had conducted.[15]

He confirmed that the interrupted stacking ring in the Foster Grant current commercial 16 SWV cup "chairman": (1) performed its intended shock absorbing and jam prevention function, and (2) provided air communication between adjacent cups in accordance with the interrupted characteristics of the '360 patent (PX–105) (R. 692–711). Edwards also testified how each of the asserted claims reads on and is infringed by Foster Grant's cup "chairman" (PX–75A–1) (R. 711–14).[16] The Court concurs in and adopts these conclusions of Edwards.

The Foster Grant current commercial cup group (PX–75) infringes claim 1 of the '360 patent. Dependent claim 3 reads on and is infringed by the current commercial cup group (PX–75).

With respect to the Foster Grant current commercial cup group (PX–75), there is a real identity of means, operation and result between the asserted claims of the '360 patent and the PX–75 cup group. The asserted claims of the '360 patent are clearly infringed by the PX–75 cup group.

## IX. FOSTER GRANT INFRINGES THE '139 PATENT

ITW charges that all of Foster Grant's packages (represented by the Wilson-Dow cup "chairman" and associated lid, the Wilson-Champion cup "chairman" and associated lid, the Wilson-Foster Grant cup "chairman" and associated lid, and the Foster Grant current commercial cup "chairman" and associated lids), infringe one or more of the asserted claims 1, 2, 6 and 7 of the '139 patent.[17]

---

14. Two sets of three current commercial 16 SWV cups (PX–75A) partially sectioned are identified as PX–77A and C, photographs being respectively identified as PX–77B and D (in PX–78).

15. On the 16 SWV cup (PX–75A), the 16 SU cup (PX–75B), and 20 PB cup (PX–75C), and the 12 S cup (PX–63A) (PX–105) (R. 692–711).

16. Edwards also recited how each of the asserted claims applies to the Foster Grant current commercial 16 SU cup (PX–75B–1), the 20PB cup (PX–75C–1), and the 24TB

(PX–75D–1), the other members of this cup group (R. 711–14).

17. The Wilson-Dow package comprises the Wilson-Dow cup "chairman" (PX–61A) and its associated lid exemplified by PX–84. The Wilson-Champion package comprises the Wilson-Champion cup "chairman" (PX–74A), and associated lid exemplified by PX–85. The Wilson-Foster Grant package comprises the Wilson-Foster Grant cup "chairman" (PX–62A) and associated lid exemplified by PX–85. The Foster Grant current commercial package comprises either the

The Wilson-Dow, Wilson-Champion, and Wilson-Foster Grant packages are represented by their respective cup "chairmen" (PX–61A, PX–74A, and PX–62A) and their associated lids (PX–84 or 85). Because of the unavailability of lids, Edwards relied upon the lid drawings PX–84 and 85 to make drawings of the above packages.

Foster Grant points out that there was some confusion as to the specific lid, including dimensional details, that was used with the Wilson-Dow, Wilson-Champion, and Wilson-Foster Grant packages.

Nevertheless, Thomas Eyles, Foster Grant's designer, testified that lids of the same configuration as that shown in PX–85 were used with all of the early containers (PX–104B, pp. 110–111). It is clear that the lids shown in PC–88, PX–89 and PX–90 conform to that general configuration.

Edwards prepared claim chart PX–94 (in PX–97) which shows how the elements of Claim 1 of the '139 patent read on the Fig. 1 embodiment of the '139 patent and on the Wilson-Dow package (R. 782–84). Edwards further prepared claim chart PX–95 (in PX–97) which shows how the elements of Claim 1 of the '139 patent read on the Wilson-Champion and Wilson-Foster Grant package (R. 789–91). These claims charts PX–94 and 95 demonstrate how the sealing means portions and integral combination holding and venting means portion of Claim 1 read on the comparable structure in these Wilson-Dow, Wilson-Champion, and Wilson-Foster Grant packages (R. 789–91). The Court adopts these conclusions and finds that the Wilson-Dow package infringes asserted claims 1, 2, 6 and 7 of the '139 patent and that the Wilson-Champion and Wilson-Foster Grant packages infringe claims 1, 2, and 6 of the '139 patent (R. 786–89, 792–94).

There is an identity of means, operation and result between the asserted claims of the '139 patent and the Wilson-Dow, Wilson-Champion and Wilson-Foster Grant package groups. The asserted claims of the '139 patent are infringed by the Wilson-Dow, Wilson-Champion and Wilson-Foster Grant package groups.

The Foster Grant current commercial packages are represented by the Foster Grant current commercial 12S cup "chairman" (PX–63A–1) and its associated lid and the Foster Grant current commercial 16 SWV cup "chairman" (PX–75A–1), (except 20 PB and 24TB), and its associated lid. The 12S and 16SWV cup "chairmen" (PX–63A–1 and PX–75A–1) with their associated lids are deemed to be representative of the various cups and associated lids within their respective groups.

Edwards prepared claim chart PX–96A (in PX–97) which shows how the elements of Claim 1 of the '139 patent read on each of the Foster Grant current commercial packages (R. 761–62). This claim chart PX–96A demonstrates how the sealing means portions and integral combination holding and venting means portion of Claim 1 read on the comparable structure in these Foster Grant current commercial packages. (R. 761–62).

Edwards further recited how Claim 1 applies both structurally and functionally to the Foster Grant current commercial packages (R. 762–66). In this connection, Edwards testified that his manometer test (PX–105) established that the accused packages would "seal, vent, and reseal" (R. 767–78). Edwards explained that when a lid was placed on the cup "chairman", the reading of the manometer increased, thereby indicating that the package "sealed". In response to the application of air to the package, the manometer reading gradually in-

Foster Grant 12S cup "chairman" (PX–63A) or the Foster Grant 16SWV cup "chairman" (PX–75A), as used with one or more of the following lids: L–142 (PX–86A), L–171 (PX–86B), 882–1 (PX–86C), L–131 (PX–86D), and L–161 (PX–86E).

creased until it reached a predetermined level, which indicated "venting". Thereafter the manometer reached a final value, which indicated that it has "resealed". (R. 767–78). Edwards also testified how the asserted claims 1, 2 and 6 are infringed by the Foster Grant current commercial packages (R. 780–82). The Court concurs in and adopts Edwards' conclusions.

Foster Grant asserts that its package is designed to avoid trapped air. This contention is not controlling as to whether the Foster Grant package infringes the '139 claims.

The sole inquiry is whether the Foster Grant package embodies the Edwards invention (e. g., sealing, venting, and resealing). The fact that the accused structure performs functions in addition to that performed by the patented structure will not avoid infringement.

The Foster Grant package has the Edwards capability of sealing, venting and resealing (R. 2561–62). Furthermore, in Foster Grant's patent (PX–98), it is admitted that the ribs 34 provide "for venting of the container during application of a closure and for allowing gases to escape, if any are generated by the contents during storage. (Col. 4, 1.19–22). Foster Grant cannot now contend that only the first purpose (i. e., avoiding trapped air) is achieved.

Foster Grant asserts that it does not infringe the asserted claims because it neither makes, uses, nor sells "packages". The Court disagrees. Foster Grant is selling both cups and lids (both imprinted with its customer's name and cottage cheese designation) to its customers who, with the blessing of Foster Grant, form the "packages" in the United States. Foster Grant manufactures its cups and lids for the specific purpose of selling them to its customers. Foster Grant has no internal organization for packing cottage cheese in its cups and lids, and thus manufactures them "to order" for its customers (R. 2560–61). In addition, it provides the required customer service to ensure proper use of the Foster Grant cups and lids for the packing of cottage cheese (R. 1968, 2561). In every pertinent sense, Foster Grant has contemplated the use of its products as a package and has aided in the assembly.

Foster Grant's accused packages in their intended environment of use, namely, for packaging cottage cheese, embody the structure defined by the asserted claims and, thus, are infringing devices. That Foster Grant's accused packages were designed for use with, and actually have been used for, packaging cottage cheese and similar dairy products has been fully established in the record (PX–98, Col. 1, lines 26–28, R. 2561).

A further Foster Grant non-infringement position is that its current commercial package does not have both "a portion offset radially outwardly . . ." (i. e., a groove) and "an integral combination holding and venting means portion adapted to be associated with said radially offset portion. . . ." Foster Grant admits that its package has a "portion . . . offset radially outwardly . . ." (i. e., a groove), but denies that it has the integral combination holding and venting means portion that cooperates with "the radially offset portion".

This conclusion depends upon reading the "integral combination holding and venting means portion" solely on "a slot or hole". I conclude that the integral combination holding and venting means portion directly reads on both "slot or hole" and the inwardly extending portion (i. e., the barb) (R. 761–62). The slots in the cup coact with, cooperate with, and are "associated with" the groove in the cup.

Foster Grant concludes its non-infringement argument by relying on alleged "new evidence", and then seeks to avoid infringement by again emphasizing that its packages are designed to prevent air entrapment. The "new evi-

dence" is not persuasive. In any event, Foster Grant's contention that its packages "are designed to prevent air entrapment", is not controlling.

The Edwards invention was designed to prevent popping lids by relieving internal pressure buildup. The defendant has established reason to doubt that such pressure is caused by gasses emanating from cottage cheese, as Edwards believed. The asserted claims do not require that the pressure buildup be due to gas generation. The pressure relieving means is the invention and the source of the pressure is not crucial to patent validity. The important fact is that the packages do vent in the manner specified by the '139 patent (R. 2561–62).

The Foster Grant current commercial packages infringe asserted claims 1, 2, and 6 of the '139 patent.

There is an identity of means, operation and result between the asserted claims of the '139 patent and the Foster Grant current commercial packages. The asserted claims of the '139 patent are infringed by the Foster Grant current commercial packages.

Foster Grant denies that the issues of infringement under 35 U.S.C. § 271(b) and (c) are present in this case. The complaint in this case alleges that Foster Grant "infringes" certain claims of the '139 patent. This case is not limited to infringement under 35 U.S.C. § 271(a). Section 271 is entitled "Infringement of patent" and includes four subsections. Consequently, ITW's charge of infringement is not limited to any particular subsection and subsections (a)–(d) have been adequately pleaded.

As has been discussed above, Foster Grant directly infringes the '139 patent under 35 U.S.C. § 271(a). In addition, ITW contends that Foster Grant is liable under 35 U.S.C. § 271(b) and (c). Foster Grant, in effect, denies that it sells packages in the United States and relies on the doctrine set forth in Deepsouth Packaging Co. v. Laitram Corp., 406 U. S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972) which establishes that there must be infringement in the United States in order to find liability as a contributory infringer.

The Court finds from the evidence that Foster Grant does sell its current commercial packages in the United States. No evidence was presented to show that any sales, much less all sales, were in foreign countries and Foster Grant has failed to establish those facts that would bring this case within the scope of the *Deepsouth* case, supra. At trial, it was implicit in all of the testimony that the events testified to occurred in the United States.

The evidence at trial established Foster Grant's knowledge of the '139 patent (PX–104B, pp. 2–23, 2–24, 2–47, R. 2964) shortly after its issuance, and that Foster Grant's current commercial lids and containers are routinely purchased together by the customer (R. 2560), and are imprinted with customer and product identification (R. 2560). It was further established that these lids and containers are assembled into packages containing cottage cheese by Foster Grant's customers, and Foster Grant knew of these activities (R. 2561). Furthermore it is clear that these packages vent after capping in the manner of the '139 patent (R. 2561–62). It was also demonstrated that the early forms of Foster Grant packages, Wilson-Dow, Wilson-Champion packages, and Wilson-Foster Grant packages, sealed, vented, and resealed as called for by the '139 patent (PX–104B, pp. 76, 116, 2–27, 2–28), and that these packages infringe the '139 patent.

Foster Grant contends that in the dry condition, its accused packages do not infringe. The evidence demonstrates that the normal intended use for Foster Grant's packages is to package dairy products. In fact, there is no evidence of any substantial non-infringing commercial use of its current packages.

Foster Grant's sale of the accused containers and lids, coupled with its knowledge of both the infringing in-

tended use and the '139 patent, establishes liability for inducing infringement under 35 U.S.C. § 271(b) and for contributory infringement under 35 U.S.C. § 271(c).

## X. FOSTER GRANT'S INFRINGEMENT IS NOT SUCH AS TO JUSTIFY AN AWARD OF TREBLE DAMAGES AND ATTORNEY FEES

The record is clear that Foster Grant inspected and analyzed ITW's patented cups prior to its entry into the plastic cup field. The record is equally clear that Foster Grant successively learned about (a) the issuance of the '139 patent, (b) the issuance of the '360 patent, (c) the issuance of the '213 patent, (d) the ITW v. CCC District Court decision, (e) the ITW v. CCC Court of Appeals decision, (f) the ITW v. Sweetheart District Court decision, and (g) the ITW v. Sweetheart Court of Appeals decision.

■ The evidence demonstrates that Foster Grant, though aware of the patent claims and the patent litigation of ITW at all relevant times, may have believed that putting the venting means in the container rather than the lid avoided the application of the '139 patent. Additionally, Foster Grant explains its disregard for ITW's patent rights by asserting that it was licensed under the '213 patent or that it thought it was so licensed. Such a belief was not founded in fact, though it is possible that some employees at some time may have entertained it in good faith. It is significant that no Foster Grant personnel testified at trial as to the existence of such a license or even as to their "belief" that Foster Grant was in fact licensed under the '213 patent, and the license defense must be deemed unproved. But it remains, nonetheless, relevant to the issue of Foster Grant's good faith.

Foster Grant asserts that it believed that the "patents were totally invalid." Despite the error of this belief, the evidence does not controvert the contention that it was held by Foster Grant's decision makers in good faith.

For the reasons advanced above, Foster Grant is not guilty of wilful and wanton infringement and/or of reprehensible conduct. An award of treble damages and attorney fees is not appropriate under 35 U.S.C. § 284, 285, and is denied.

## XI. THE EDWARDS' '213, '360 and '139 PATENTS ARE VALID

### A. Edwards' Patents are Presumed Valid Under the Statute

■■ The burden of establishing invalidity of a patent rests heavily on a defendant. The statutory presumption of validity of a patent is not to be overthrown except by clear and cogent evidence.

■ The presumption of validity arising from the grant of a patent is strengthened where, as here, the invention was useful, and answered a need in the industry.

■ The presumption of validity is additionally strengthened where the prior art relied upon by Foster Grant is the same as and no better than that considered and rejected by the experts of the Patent Office.

■ Furthermore, where the principal art relied upon by Foster Grant is the same as or no better than the art considered and rejected by the District Court and Court of Appeals in ITW v. Continental Can Company (involving the '213 and '139 patents), ITW v. Sweetheart Plastics Co., (involving the '213 and '360 patents), and ITW v. Solo Cup Co. (involving the '213 and '360 patents), the defendant has the burden of presenting "persuasive new evidence" of invalidity. Therefore, the presumption of patent validity, under 35 U.S.C. § 282, is entitled to even greater weight.

The "law of the circuit" rule of the Seventh Circuit is established in American Photocopy Equipment Co. v. Rovico, 384 F.2d 813 (7th Cir., 1951), cert. de-

nied, 390 U.S. 945, 88 S.Ct 1030, 19 L. Ed.2d 1133. If there is no new evidence of invalidity, the District Court will follow its Court of Appeals decisions based on the same evidence. However, notwithstanding the *Rovico* rule, this Court has considered the evidence "de novo", i. e., independently from and without reliance upon the prior ITW decisions, and in addition, has considered some new evidence which it has found unpersuasive.

**B. Relationship of the '213 and '360 Patents**

The '213 patent (PX–2), although based in part on the earlier filed original application (Ser. No. 699,678, filed November 29, 1957) (PX–5), actually issued on June 30, 1964, about one year after the '360 patent. The subject matter of both the '213 and '360 patents was disclosed in the continuation-in-part application, Ser. No. 679,057, filed October 29, 1958 (PX–7), and the '213 patent matured from an application divided out of this application, Ser. No. 697,057 (PX–6). This application then issued as the '360 patent (PX–3).

The application (PX–6) from which the '213 patent matured was divided out of the C.I.P. application (PX–7) in response to a requirement for restriction made by the U.S. Patent Office Examiner. Accordingly, even though the '360 patented invention issued as an improvement over the '213 patented invention, these patented inventions stand on the same footing with respect to the prior art, and each enjoys the benefit of everything common to both, for example, the Z-shaped stacking configuration in the sidewall below the rim with all of its beneficial attributes.

In considering the validity of each of the '213 and '360 patents, neither patent may be used as a prior art reference against the other. 35 U.S.C. § 121 specifically states that this rule of law applies where one of two co-pending applications ('213 application) is a division of the other ('360 application) filed tion requirement is made by the Patent Office by the same inventor, where a restriction requirement is made by the Patent Office.

Thus, in this Court's consideration of the validity of the '213 and '360 patents, each must be considered individually in the context of the prior art, and not in the context of the other. Under the statute (35 U.S.C. § 121), the claims of the two patents in suit must be considered with respect to each other in the same manner as one considers the claims of a single patent with respect to each other.

One of Foster Grant's invalidity defenses is based on Continental Can's early plastic containers having double stackers. Thus Foster Grant contends that Claim 1 of the '213 patent and Claim 1 of the '360 patent read on more that one stacking ring—notwithstanding the fact that the drawing, specifications, and clear language of Claim 1 of both patents establishes that only a single stacking ring is called for by these claims. In Claim 1 of both patents, the stacking ring means is defined as including an intermediate support section having at its lower extremity "externally projecting shoulder means" and having at its upper extremity "internal shoulder means." In addition, the "internal shoulder means" is defined as being "adapted to form a shelf to coact with the complementary external shoulder means of a like container. . . ."

Thus, the "internal shoulder means" at the upper extremity of the intermediate section of a lower container must form a shelf to coact with the complementary "external shoulder means" at the lower extremity of the intermediate section of an upper container. This excludes a double stacker, because in a double stacker, the internal shoulder means (as the upper extremity of the intermediate section) of a lower container would coact with the middle shoulder means of an upper container and not the defined external shoulder means at the lower extremity of the intermediate section of the upper container. Claim 1 of

the '213 and '360 patents defines a single stacking ring only (R. 677,2989).

As is treated fully above, the claims, drawings, and specifications of the '213 and '360 patents clearly establish that a single stacking ring is called for by the claims. Thus, Foster Grant's contention that the '213 and '360 patents are not limited to a single stacking ring is without merit.

In contesting the validity of the '213 and '360 Edwards patents, Foster Grant relies upon (1) Continental Can's experimental developments, and (2) prior art patents and publications. However, neither the prior experimental developments nor the prior art patents and publications disclose or teach the subject matter defined by the asserted claims of the '213 and '360 patents in suit. Therefore, Foster Grant has not proven any "anticipation" under 35 U.S.C. § 102.

With respect to Foster Grant's own developmental activity, no cups were produced until 1962 (PX–103). This activity is long after the development of Edwards '213 and '360 inventions in 1957 and 1958 respectively (PX–21, PX–29, PX–35, PX–36; R. 471–75, 487–93, 508–10). Thus, none of Foster Grant's activities can be considered "prior art" and cannot be an "anticipation" under 35 U.S.C. § 102.

With respect to Continental Can's experimental developments, they were not prior art and/or were not "anticipations" (35 U.S.C. 102) of or did not render obvious (35 U.S.C. § 103) the '213 and '360 inventions.

In contesting the validity of the '139 patent, Foster Grant relies upon (a) an alleged development of Kent Plastics Co. and (b) prior art patents. None of these is more pertinent than the prior art which has been considered by the Patent Office.

■ No doctrine of the patent law is better established than that a prior patent or publication, to be an anticipa- tion, must bear within its four corners adequate directions for the practice of the patented invention. Thus, under the authorities, Foster Grant has not established that the asserted claims in the '213, '360 and '139 patents are "anticipated" under 35 U.S.C. § 102.

Edwards' inventions are the products of inventive faculties and are not obvious under 35 U.S.C. § 103. The proof of "nonobviousness" is that none of the prior art patents or structures, which Foster Grant has developed by its extensive search of the prior art, discloses the Edwards nestable container inventions, i. e., a one-piece, nestable, thin-wall, plastic container having the claimed bottom, the claimed sidewall, the claimed rim, and a circumferential stacking ring in the sidewall below the rim having either a continuous or an interrupted Z-shaped configuration—which is the structure defined by the asserted claims of the '213 and '360 patents.

With respect to the '139 invention, the proof of nonobviousness is that Foster Grant has failed to locate a prior art patent or structure that discloses or teaches the Edwards '139 invention. Edwards succeeded where others failed and the failure of others having at least ordinary skill in the art is compelling evidence of nonobviousness.

The test of obviousness must be applied in the context of the circumstances that existed when Edwards made his nestable container inventions in June, 1957 and June, 1958, and not in the context of today's technology and not with the full benefit of the teachings of the '213 and '360 patents. The same is true for the '139 patent. Further, the exceptional commercial success of the Edwards' inventions, although a secondary factor, is evidence of the "nonobviousness" of Edwards' inventions defined by the asserted claims of the '213, '360 and '139 patents.

Foster Grant has challenged the claimed '213 conception date. This is pertinent because of the Continental Can

7AB–Special cup. The Court finds that this Continental Can cup was not developed until after Edwards made the '213 invention and, as such, is not prior art with respect to the '213 patent. I find that Continental Can was involved in the late 1950's in an experimental program of attempting to design a plastic vending cup, a plastic food container, and a plastic ice cream container. Some of the experimental designs were mere proposals, some never went beyond the drawing stage, most never went beyond the laboratory state (and were actually unsuccessful efforts or abandoned experiments), and a few were manufactured in limited quantities and apparently were distributed upon an experimental basis in limited numbers to a few Continental Can customers who found them to be unacceptable. None of these was a successful container embodying either of the Edwards inventions.

These Continental Can cups or containers are not prior art, and are no more than unsuccessful developmental efforts and/or abandoned experiments. The results of this continuous activity caused the entire plastic program at Continental Can to be abandoned and discontinued. As such, none of the Continental Can efforts have any prior art status.

Foster Grant relies on a great number of tests run by Mr. Johnson on simulated, alleged prior art Continental Can containers and on post-Edwards commercial containers. None of the containers tested was available in 1957, 1958, or before (R. 2178). With respect to the recently fabricated alleged prior art Continental Can cups, they were manufactured from material that was not available in 1957–58, on machinery that was not available in 1957–58, and by thermo-forming processes not used in 1957–58 (R. 2221).

Specifically, Johnson, Foster Grant's expert, admitted on cross-examination that there was no attempt to duplicate the process variables, such as sheet thickness (R. 2283), plug design (R. 2284–87, 2291–94), and plug temperature (R. 2288–90, 2293–94) which were actually used to make the alleged prior art cups. Johnson also admitted that the selection of these variables alters the construction and performance of a cup or container (R. 2294–95). These tests were all made on cups and containers manufactured by today's technology. The mission of this Court is to determine the prior art "at the time the invention was made", 35 U.S.C. § 103. The advance in technology since 1957 and 1958 cannot be denied and demonstrating what can be achieved with today's technology does not shed any light on what was possible with the technology existing when Edwards made the '213 and '360 inventions. Consequently, these "after the fact" tests conducted by Foster Grant for the purpose of this lawsuit have limited probative value.

For the foregoing reasons, the asserted claims of the '213 and '360 patents define a patentable combination, not an old combination. These claims are valid and Foster Grant's "old combination" argument is without merit.

The patents (DX–281) and prior devices suggested by Foster Grant taken individually, or in any combination, do not anticipate (35 U.S.C. § 102) or render obvious (35 U.S.C. § 103) the '213 invention or the '360 invention.

Having analyzed the scope and content of the prior art, the differences between the prior art and the asserted claims of the '213 patent and '360 patent, it is concluded that the inventions set forth in the asserted claims would not have been obvious to one having ordinary skill in the art at the time the invention was made.

Foster Grant relies upon an alleged development of Kent Plastics Corp. and several prior art patents against the '139 patent in suit. However, the proofs are not sufficient to meet Foster Grant's burden of showing that the Kent development preceded the '139 invention and

the Kent Plastics package is different from the '139 Edwards invention in both structure and function and neither anticipates nor renders obvious the '139 invention.

The Kent Plastics package, the Hydro-Chemie container, and the relied-upon patents (DX–345), taken individually or in any combination, do not anticipate (35 U.S.C. § 102) nor render obvious (35 U.S.C. § 103) the '139 invention.

None of the newly-cited patents is as pertinent as those which have been previously considered, and Foster Grant's contention that the patented prior art invalidates the '139 patent is without merit.

Having analyzed the scope and content of the prior art, the differences between the prior art and the asserted claims of the '139 patent, it is concluded that the invention set forth in the asserted claims would not have been obvious to one having ordinary skill in the art at the time the invention was made.

## XII.   FOSTER GRANT'S OTHER DEFENSES

I find that the '213 patent is not invalid for double patenting and that the '213 and '360 patents are not invalid under 35 U.S.C. § 112. I find that the '139 patent was not obtained under false pretenses.

The '139 invention solves the lid popping problem due to pressure increases from any source, e. g., temperature rise, atmospheric pressure decrease, weight of stacked packages, and impact of forces caused by bouncing packages during transit (R. 339–40, 345, 528, 900, 937–38). The probability that cottage cheese does not generate gas is not controlling.

The testimony is in conflict over whether or not ITW ever saw the Hydro-Chemie container. Mr. Hartmann of Owens-Illinois stated that it was not shown to ITW representatives in the meetings between Owens-Illinois and ITW (DX–309, pp. 33, 39). It is not certain from the evidence that ITW can be charged with knowledge of the alleged container even as late as 1969.

In any event, the Hydro-Chemie container neither anticipates (35 U.S.C. § 102) nor renders obvious (35 U.S.C. § 103) the '139 invention.

## XIII.   ITW IS NOT GUILTY OF MISUSE

Foster Grant asserts that ITW is attempting to restrict the sale of containers per se by its assertion of the '139 patent. ITW contends it is only asserting the "package" claims of the '139 patent against Foster Grant's manufacture and sale of its lids and containers which comprise self-venting packages (35 U.S. C. § 271(a), (b), (c)).

Foster Grant bases its misuse defense on the assertion that ITW's customers "get an implied, royalty-free license to make the patented 'self-venting package' (R. 2484, 2485)."

Title 35, Section 271(d) provides:

"(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which, if performed by another without his consent, would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which, if performed without his consent, would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement."

It is clear that by virtue of Section 271, a patentee who sells a complete combination can bring an action against a contributory infringer, and such bringing of a suit is not in itself a misuse of the patent monopoly.

Foster Grant presents allegations of either positive misrepresentations or the withholding of certain facts from the Patent Office and/or the Courts as a basis for asserting an "unclean hands" defense.

The gasification of cottage cheese has been fully treated above. The evidence establishes that ITW believed that cottage cheese does generate gas and no evidence was presented to suggest that ITW felt differently before or during the prosecution of the '139 patent. Thus this contention of an alleged misrepresentation is without foundation.

■ I do not find from the evidence that there has been patent misuse, or unclean hands, and this Court finds that the '213, '360 and '139 patents are each fully enforceable.

## CONCLUSIONS OF LAW

This Court has jurisdiction over the parties and over the subject matter of this suit. Venue is properly laid in this District.

ITW has title to United States Letters Patents Nos. 3,139,213; 3,091,360 and 3,061,139 and is the owner of all rights thereunder, including the rights to sue for and recover for past infringement.

ITW has maintained its burden of proving the essential facts alleged in its complaint. Foster Grant has not maintained the burden of proving the essential facts of any of its affirmative defenses and Foster Grant has not maintained the burden of proving the essential facts alleged in its counterclaim.

■ United States Letters Patent No. 3,139,213, entitled "Nestable Cup", as to Claims 1, 2, 3, 5, 6, 7, 8 and 9 is in all respects valid and subsisting in law.

United States Letters Patent No. 3,139,213 as to Claims 1, 2, 3, 5, 6, 7, 8 and 9 is infringed by Foster Grant by its manufacture and sale of its accused containers.

■ United States Letters Patent No. 3,091,360, entitled "Nestable Cup", as to Claims 1 and 3, is in all respects valid and subsisting in law.

United States Letters Patent No. 3,091,360, as to Claims 1 and 3 is infringed by Foster Grant by its manufacture and sale of its accused containers.

■ United States Letters Patent No. 3,061,139, entitled "Self-Venting Package", as to Claims 1, 2, 6 and 7, is in all respects valid and subsisting in law.

United States Letters Patent No. 3,061,139, as to Claims 1, 2, 6 and 7 is infringed by Foster Grant by its manufacture and sale of its accused packages.

ITW has not been guilty of patent misuse or unclean hands, and United States Letters Patent Nos. 3,139,213, 3,091,360 and 3,061,139 are each enforceable.

ITW is entitled to an injunction restraining Foster Grant against further infringement of United States Letters Patent No. 3,139,213, as to Claims 1, 2, 3, 5, 6, 7, 8 and 9.

ITW is entitled to an injunction restraining Foster Grant against further infringement of United States Letters Patent No. 3,091,360, as to Claims 1 and 3.

ITW is entitled to an injunction restraining Foster Grant against further infringement of United States Letters Patent No. 3,061,139, as to Claims 1, 2, 6 and 7.

ITW is entitled to an accounting by this Court to determine the amount and extent of damages, and the cause is continued as to the accounting issues, pursuant to Rule 42 of the Federal Rules of Civil Procedure.